Good morning. We have three cases this morning, and the first is number 07-2580, Meadows v. Anchor Longwall and Rebuild Inc. at SEC. Mr. Schubert, Ms. McAllister, and Mr. Winnikoff. Is it Anchor Longwall or Longwell? Longwall. Okay. It is right here. May it please the Court, my name is Richard J. Schubert. I represent the plaintiff's appellants in this matter. I would like to talk to you very briefly, factually, and... Do you wish to reserve any time for rebuttal? Yes, Your Honor. Two minutes, please. That would be fine. I apologize. No, no problem. I want to talk to you a little technically and a little factually to start with. First of all, you rely on a hydraulic system every time you get into your automobile. Particularly if you have power breaks, you can understand the technical aspects of this case. Basically, our expert, Mr. Sulkowski, explained it on page 132 of the appendix. But what he is saying is that when you step on your brake, you are activating a hydraulic system because there is brake fluid in your brake line. This system did not have a ram bar, correct? That is in dispute. It is not the ram bar. It is the base ram lift, the cylinder. Okay. That is what I was talking about with the brakes, Your Honor. When you step on a power brake system, if you look under the hood, there is a compressor that increases the pressure from your foot to send a spike of pressure to the brakes to make them activate. What these cylinders are, are extra pressure units or compressors. And there is a factual dispute in our opinion as to whether there was or was not a base lift jack. And if you look at page 252 of the appendix, there is a drawing that shows that a base lift jack or a cylinder is at the bottom of the C-shaped device called a mine shield. And then there are two other cylinders that lift up the top or the canopy to the roof. Now, under our theory of the case, Mr. Meadows had to perform an unusual procedure because in most cases, mine shields are activated by a remote control. In this type case, he had to do it manually, reach around and push some levers. When you do it remotely, you can depressurize the base lift jack or the compressor and it is more automatic. It had to be done manually. Mr. Meadows did not have time to do it. As a result, there was pressure in the base lift jack when the... Wait a minute, you said it can be done manually, but Mr. Meadows didn't have time to do it. Didn't have time to do it manually? He didn't have time to do it remotely because it would have required a replacement part. The connection for the remote control was defective on this machine. So the pounds per square inch went from somewhere between two and three thousand to somewhere between thirteen and fifteen thousand very quickly, is that correct? At least. And the question is for Mr. Sekulski, what can he do to get there? And the judge said, look, he fails under the second and third prongs of the Daubert test. Wouldn't he have had to include in the shield's hoses and connectors to really demonstrate what caused the valve to burst? No, it's not a question of what caused the valve to burst as to Anchor-Longwall. Anchor-Longwall's problem is they didn't put these check valves in, which would have prevented this spike in pressure. And it's a spike, it's not a gradual buildup. And he explained it, again, by pressing on the brake of your car, you hit it, it gets to the compressor and it shoots an extra shot. I'm sure some of you remember manual brakes on cars before power assist. It required significantly more effort to stop a car than it does these days. That's because of this compressor unit and that's what these things do. They create spikes of pressure in a hydraulic system so that you get greater effort for less work. Yeah, but the question, doesn't he have to answer, what would have caused the valve to burst without causing the hoses and connectors to fail before that? He explains that, Your Honor, in pages 168 and 169. It's not a pressure that's constant, it's a spike. And if you look at his analogy to the water system where you have an elbow, water is going to hit that elbow and there will be a spike at the elbow such that you have to reinforce that. And he gave an example where he designed a hydraulic sprinkler system at the VA hospital which had to be reinforced with concrete blocks so that the spike would not penetrate the... What did he specifically do and tell the judge that he had done with respect to testing the valves' susceptibility to bursting? The valves were tested, in his case, to see if they met the rated pressure and the way they came apart. Typically, when you have a valve that separates, it should separate and leave threading behind. He measured the threading on the male and female components of the valve and said that the threading was inadequate and that the only way that anyone could explain the ovaling of this ball that sits in the middle of the valve the ball has a hole that goes through it to let fluid through and then rotates closed. It was closed when this spike occurred and that's the only time you could get that pressure. He gave the example of etching with a punch. You can take a letter and try and press it into metal with a punch all you want and it won't work. You tap it with a hammer, create a spike of pressure and you get an indentation and you get an etching. That's how he explained a spike. Very basic, simple terms that Layman could understand. That it was a spike and that's why the hoses didn't burst because the spike isn't continuous. It's dynamic and that's what he meant. It flows and it's not here and here. It goes from one spot to the next. It's much like an air gun. But did he actually subject the valve to pressure in a manner that would have tested its susceptibility to bursting? He did when he hooked it up to a pipe. The judge thought he hadn't. Well, he hooked it up to a pipe and ran up the pressure and that's where he demonstrated between 13,000 and 15,000 psi. Did he do it the same time that he tested the hoses and the valves? Or the hoses and the connectors? No, you don't need the hoses in a spike situation. He was only testing the valve separately to demonstrate its burst capacity. There is no way to replicate a spike. That had to be done theoretically using the Newtonian physics that he talked about in his testimony. You can't replicate a spike of the nature that was created in here and that's why he can't test the hoses. And again, the hoses, he explained, hoses, if it's continuous pressure, will burst before a valve. However, in a spike situation, the weakest link breaks. And in this case, the valve broke. Therefore, it was the weakest link in a spike situation. But that's the problem that the district court, I think, had with understanding that continuous pressure versus spike. And again, he explained that you create a spike when you step on your brakes in a power-assisted car unit. So, it's spike versus continuous. I urge you to read his testimony at 168, 169 of the record. Also at 132 where he talks about the water pressure and braking systems. Briefly on the product's liability issue, I think the critical case as to Anker Longwall is the Calumetals case. And the judge in that case sets forth a very detailed analysis of Pennsylvania law where he discusses the application of a bailment situation to the situation which I believe exists in this matter. You're talking about strict liability now? Yes, Your Honor. As to... Is that a question of fact or law in this case? It was a question of... It was a mixed question. There were questions of fact, which I think the district court answered, which were questions for the jury. Much the same in the FIT situation for the Dower test, I think there were factual questions whether the baselift jack was there or not. The inspector said it was there, but he might have gotten it from the notes. There were pictures which we admitted that showed that there was a baselift jack on the mine shield in question. So I think there were a lot of questions in fact here that were conflicting and were capable of being resolved either way by reasonable jurors. With respect to our position versus Steko, I believe that the Second Circuit cases that we've cited, Project Hope... But Steko, you didn't object, right? I did object, but the court wouldn't let me object. I filed a brief, but the court didn't consider it. We had an adversarial relationship from the beginning. We hired separate experts. We came up with different theories of the case, why the valve was defective, why the valve wasn't defective. And under the Project Hope case, if there's an adversarial relationship established, at the outset, then there has to be no cross-pleading between plaintiff and third-party defendant. I believe that the Judge Conavoy in the Middle District in 1980... You're saying that doesn't have to be... You can't recover a judgment here against the third-party defendant, can you? No, Your Honor, but I can produce evidence against them without having to amend my complaint. Why does it help you if you do that? Because I want to tell you, I was a state judge once. I swear this happened. The nerve, I couldn't believe it. The third-party defendant, who was not a direct defendant, got up and in the opening, actually said to the jury, I have to level with you. It was my client that was responsible solely for this. Now, if that jury believes that, the third-party defendant wins, because the defendant wins. And, you know, I can't remember how it came out. I almost fell off the bench. But that's what they did. But, I mean, how does it help you if the third-party defendant is liable? My evidence as to the first-party defendant, I think, is adequate as well. And if I have to do that at trial, Your Honor, that's a chance I'll take. I just want my chance at trial. And my client wants a chance at trial. You know, that's part of the risk of trying cases. If the third-party defendant, at least in New Jersey, had been made a third-party defendant before the statute of limitations had run, on what would have been a direct suit under New Jersey law, at least when I was a New Jersey judge, the plaintiff could join the third-party defendant directly, even after the statute ran, provided the original defendant sued him before it ran. That's the same in Pennsylvania civil procedure. But that doesn't happen here. No, it was past statute. So that's a new Pennsylvania law, too? Yes, Your Honor. I just have a few seconds remaining. And, again, I believe that the trial court made factual determinations improperly, both on the summary judgment motion and in the Dauber hearing regarding credibility of witnesses. Isn't the critical thing to get you to trial whether you can have your expert testify? Exactly, Your Honor. If we should affirm as to the defendant that everything that you say about the third-party defendant is moot. Correct, Your Honor. Okay. Thank you very much. My time is up. Thank you, Your Honor. We're back on rebuttal. Ms. McAllister. May it please the Court, I'm Kathleen S. McAllister, and I represent Anchor, Longwall, and Rebuild, Inc. There are a number of interesting legal arguments in this case, but I would submit that this is all fact-driven, and was all fact-driven from the beginning. From the very beginning of this case, it was important to establish whether or not these plaintiffs could verify the specific shield that Mr. Meadows was working on at the time of his unfortunate accident. It wasn't 45? Well, we never found out that it was shield number 45 until late in discovery, and that's what triggered the joinder that occurred later on. If it is shield number 45, then plaintiff cannot win, because the evidence is clear in the record that shield number 45 did not have a base lift cylinder, and plaintiff's expert, Mark Sokolsky, was equally crystal clear that his overpressurization theory, the where he gets his pressure strike of up to 100,000 PSIG, comes directly from the base lift cylinder, which simply was not present in shield number 45. That's indicated in the records of Anchor Longwall, who refurbished this particular shield, because they would have charged extra to repair and replace it, and they did not. And just to the contrary, they charged an additional sum of money to cap off ends, because of the fact that it was, in fact, missing a base lift shield. Was the allegation ever made that the failure to have a base lift shield, if this were 45, if this actually happened at shield 45, that that in and of itself could have caused the injury? No, that allegation was never made. Never made. And instead, Mr. Sokolsky very clearly concedes that he needs that particular equipment. He simply wasn't aware that it wasn't there, because he never examined the shield. Chain of custody was very suspicious in this case, and whether or not we had the right valve, and whether or not we had the right shield, was an issue all along. Separate and apart. But isn't, let's just say, you say it wasn't 45, or if it was, I'm sorry, you say if it, are you saying it was 45, but we don't know if it was 45? Evidence appears clear that it was 45. At the tail end of the case, when it became clear that Mr. Sokolsky was relying on the fact that shield number 45 did in fact have a base lift cylinder for his theory, then plaintiff shifted and said, well, perhaps it was another shield. But that simply won't work, because Anchor Longwall refurbished 39 of 180 shields. So in that case, we don't know whether Anchor Longwall would belong in the case or not. And plaintiff's theory would equally fail, because they could not tag Anchor Longwall as being the entity that refurbished the particular shield that the plaintiff was working on. So either way, this is fact-driven, and leads to a conclusion that plaintiff's theory of liability, which is necessarily based on what his expert says, simply has no legs to it. It is all fact-driven in this case. And as I say, there are a number of things you can talk about. You can talk about whether Mr. Sokolsky's testing was adequate. We don't think it was, because we think he failed to do the kind of test that would say, well, what about the hoses? They're made of rubber. What about the connections? There's a potential weak link there. But isn't the Gilbert threshold quite low to me? The threshold... Clearly, I mean, this guy's clearly an expert, number one. Absolutely. So this case comes down to the second and third prongs. But usually, to get over the threshold, it's like, you know, it's like we've done many times at trial. You bring up a witness. You attempt to certify them. It's almost pro forma. As to qualifications, I'll agree. And as to that, there's no question about Mr. Sokolsky. His testing and what he looked at and whether his theory can be supported are two different issues, though. On the one hand, he repeats over and over that this is basic Newtonian physics and perhaps it was too basic. But that's not the issue. His testing, when he takes a valve that is normally connected to rubber hoses and pressurizes and simply hooks it up to a metal pipe, does nothing to duplicate the situation that was present in that mine. And none of his tests did this particular valve. And he only did two tests. One was just to stick the valve in the freezer. And that was agreed by all. It didn't apply to anything that related to the case. But he only then does two tests. And in neither of those tests does the valve burst. So not only is the foundation of the test effective because of the fact that you've got other important components of this system that are not even contemplated by the expert, but you have a situation where the valve didn't burst. So I think as to both the second and third criteria, Mr. Sikorsky fails. The testing is not relevant to the situation. What could he have done to meet the second and third problems? I mean, he worked backwards, but was there any other way he could have proceeded? You're trying to figure out what caused something happened. I think he was brought onto this case too late. He wasn't able to see the actual shield someone, because they wanted to keep this mine working and up and moving, removed the valve immediately, replaced everything. And so who knows what shield he was actually working on. The inspector's report that was located late, late into the case seems to suggest that it was in fact number 45. Number 45 does not have the necessary component that would get the expert the necessary ingredient he needs. And based on that, I don't know that there was anything that Mr. Sikorsky could do at that late date that would get him what he needed. He certainly could have taken an exemplar long wall shield that did have all of the components and run certain tests with that, but he did not do that. He could have purchased an entire hose kit that would have included the hose, the connector and the valve, and did not do that either. And the other thing that wasn't demonstrated in either of his tests is the ovaling that Mr. Schubert talked about. That was highlighted by Mr. Sikorsky as being very significant in his findings, but he couldn't duplicate that in any testing. And based on that, I don't know that his testing means anything. I mean, what he's saying is, look, I'm just trying to get to a jury. And maybe these are questions for Mr. Schubert, but normally you don't see too many Dalbert rejections. I agree. And normally what happens is if it's, as you say, a fact issue, you let facts go to the jury and they sort them out. You may very well win because of the dearth of evidence that may exist with regard to exactly which shield was in place, et cetera, et cetera. But it just seems as if it's a low bar. And I realize that the standard here, however, is arbitrary and capricious. Is that correct for Dalbert? I believe it's an abuse of discretion. Okay, same thing. And so you have to deal with it. You're talking about our standard of review of the district court. Correct. There is no scenario, based on everything that was presented, that this expert can ever put himself in a position where he can go forward based on what he has testified to and based on what his report was. He simply has no legs to his opinion. The absolute base, the base lift cylinder, must be there. And if it's not there, he has nothing to go forward with. And I don't think that there is any question of fact as to that issue. If we concede for argument's sake that it's shield number 45, then every bit of evidence that exists in this record is that shield 45 does not have that necessary component. If we don't concede that it's shield number 45, then there's no reason that anchor longwall should be in this case at all. Because it may not be your shield. Correct, correct. What's the purpose of the base lift cylinder? It is if you're working in a mucky or muddy environment, it will allow the toe to raise or lower so that you can slide this in. It's not necessary, and the president of the company testified at the Dalbert hearing, that you can use longwall shields in normal operation without that component. And clearly in the record it was sold without it. The bottom line of your argument is really quite simple. That you can't be liable if it's your product because your product doesn't have the component that caused the problem. And if it's not that particular product, then nobody could say that it was your product. That's it. And I hesitate to use the word product because of the other issue that's in this case. Because of the strict liability issue. Correct. Your item, I understand. Yes. But laying that aside. So it's sort of heads he loses, tails you win. That's my argument, Your Honor. How about the strict liability? I guess that's briefed. It is briefed and we're not a seller. We don't manufacture. We simply are a repair service and provided labor only. Do you agree that the third party complainant is moot if you win on the appeal? Yes. Okay. Thank you very much. Thank you, Your Honor. We'll hear from Mr. Winnikoff. Good morning, Your Honor. Stanley Winnikoff for Systems Deco. In view of the judge's last comment, I'm not sure that there's really much for me to argue. I'm not going to argue on the issue of the admissibility of the expert's report or in the dismissal of the strict liability claim. The only thing left as to my client, Systems Deco, is an argument raised in the appellant's brief as to whether or not there was an error in granting the motion for summary judgment as to Steco on the contribution claim. And I think under the facts of that case, that was an eminently reasonable and correct decision simply because at the time, counsel for Anchor Longwall filed her pretrial report. Her expert said that there was nothing defective about the valve and therefore, there was no basis for liability on the part of the defendant against the third party defendant. In essence, Anchor Longwall abandoned the third party complaint since the plaintiff never issued a Rule 14 complaint against the third party defendant. I don't think, I'll use the phrase, he had no dog in that fight. He had no standing to complain of the dismissal of Systems Deco. It was not his complaint and he suffered no harm because of it. Again, the court earlier noted that he could not get a judgment against us under these circumstances and therefore, that makes the harm to him harmless. All right. I have no further questions. Good morning. I don't have anything. Thank you, Justice. Mr. Schubert. Your Honor, Judge Ambrose, I believe you hit the nail on the head and the crux of my argument is that this is a fact-driven case and facts are for juries. There is a dispute as to whether there was a baselift cylinder. We introduced photographs showing, taken by the company of the product involved in the injury and it showed a baselift jack. How did you get the information that led you to believe that this was Shield 45? That's what the mine inspector said. But again, if you read his testimony, it's not in the appendix but it is in the trial court's record. He waffled on whether it was there or not. He didn't know how he came about that information but you should also look at page A247 in the record which is an Anchor Longwall record and about two-thirds of the way down the page, it shows that there are four socket head bolts and four nuts for a baselift cylinder installed when they get one. So the mine could have put the baselift cylinder on before it went underground. There is plenty of evidence, at least disputed evidence, as to whether 45 had a baselift cylinder. And the reason, I take it, you must have a baselift cylinder in order for Sikorsky to give the testimony or the testimony that you were attempting to have him give, is that correct? That's what he said in his testimony and I can't dispute that, Your Honor. But I believe there's disputed evidence and when there's disputed evidence, we need juries. Simple as that. And that's why we have them. But as to 45, what other investigating did you do to find out? I mean, your complaint alleged that it was 45, did it not? No. How it came about was we, late in the game, I was not original counsel on this, Kate. Late in the game, original counsel took the deposition testimony of James Bentz, who is referenced in the trial court opinion and whose excerpts from testimony were given to the trial court at the Daubert hearing. Mr. Bentz testified that it was shield number 45. Then we began to look into shield number 45 through long wall documents, et cetera. We also, prior to that time, had photographs which were taken by Mr. Markovich, who was an employee at the Maple Creek Mines, supposedly of the shield that injured Mr. Meadows. And it shows in those photographs a baselift jack. So if the inspector says it was 45 and Markovich's picture says this is the one that hurt Meadows, then it had a baselift jack. And if they have evidence to the contrary, then we have disputed evidence. And if this were a motion for summary judgment, the district court should not grant judgment because disputed statements of fact are for juries. And that's our contention in this case, that the district court went a little bit too far in making factual determinations to exclude our expert. And I think it's improper. As you said, the standard about credibility goes to the weight that is given to the expert's testimony, not to its admissibility. All right. But you realize that our standard is abuse of discretion with respect to experts being qualified or disqualified. We understand that, Your Honor. But we think that given the testimony of Mr. Sikowsky, his qualifications, his excellent explanations of these things in detail, that the district court did abuse its discretion in this particular case. Thank you very much. Thank you. Thank you to all counsel for well-presented arguments. We'll take the matter under advisement.